## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MELVYN KLEIN, Derivatively on Behalf of Nominal Defendant TESLA, INC., | ) ) | |
| | ) | CASE NO.: |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| ELON MUSK, BRAD BUSS, ROBYN DENHOLM, IRA EHRENPREIS, ANTONIA GRACIAS, STEPHEN JURVETSON, JAMES MURDOCH, KIMBAL MUSK, and LINDA JOHNSON RICE, | ) ) ) ) ) ) ) ) | |
| | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| TESLA, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Tesla, Inc. ("Tesla" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Tesla with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of and for the benefit of Tesla, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties and other wrongful conduct as alleged herein. Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to Tesla, including damages to its reputation and goodwill.

2.    Tesla, a publicly traded company, is a leading designer, manufacturer and distributor of specialty vehicles and related aftermarket parts and services.

3.    This action relates to a pattern of conduct relating to communications made by Elon Musk ("Musk") (the Chief Executive Officer ("CEO") of Tesla) to the investing public that were not reviewed or overseen by Tesla's Board of Directors (the "Board") because it lacked internal controls and procedures, and culminating in a series of false and misleading statements made by Musk on August 7, 2018 regarding taking Tesla private.

4.    The misconduct of Tesla and its officers and directors negatively impacted its stock price and goodwill and has subjected it to various litigations including two actions filed by the SEC (*United States Securities and Exchange Commission v. Tesla, Inc.*, Case No. 1:18-cv-08947 (SDNY) ("SEC/Tesla") and *United States Securities and Exchange Commission v. Musk*, Case No. 1:18-cv-08865 (SDNY) ("SEC/Musk") and multiple securities class actions including that consolidated action, *In Re Tesla, Inc. Sec. Litig.*, Case No. 3:18-cv-04865-EMC (N.D. CA) (the "Securities Class Action").

## JURISDICTION AND VENUE

5.    Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

6.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Tesla, occurred in this District; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

8.     *Plaintiff Melvyn Klein* ("Plaintiff") is a current Tesla shareholder and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein. Plaintiff will continue to hold Tesla shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

9.     Nominal Defendant Tesla designs, develops, manufactures and sells high-performance fully electric vehicles, and energy generation and storage systems, and also installs and maintains such systems and sells solar electricity. The Company is incorporated in Delaware and with its principal executive offices located at 3500 Deer Creek Road, Palo Alto, California.

**Director Defendants**

10.     ***Defendant Elon Musk*** ("Musk") is the CEO and was Chairman of the Board of the Company.  As stated in Tesla's Form DEF 14A filed with the SEC on April 26, 2018 (the "2018 Proxy Statement"), Musk has been CEO since October 2008 and Chairman since April 2004.  Musk is co-founder of Space Exploration Technologies Corporation ("SpaceX") and has served as its CEO, Chief Technology Officer, and Chairman of its Board of Directors since May 2002.  Musk also served as Chairman of the Board of SolarCity Corporation ("SolarCity", a solar installation company), from July 2006 until its acquisition by Tesla in November 2016.  Musk is also a founder of The Boring Company, an infrastructure company, and Neuralink Corp, a company focused on developing brain-machine interfaces.  Elon Musk and Defendant Kimbal Musk are brothers.

11.     ***Defendant Brad Buss*** ("Buss") has served as a member of the Board since August 2016.  Buss is a member of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.  As stated in the 2018 Proxy Statement, Buss served as Chief Financial Officer ("CFO") of SolarCity from August 2014 until February 2016.

12.     ***Defendant Robyn Denholm*** ("Denholm") has served as a member of the Board since August 2014.  Denholm is the Chairperson of the Audit Committee and is also a member of the Compensation Committee and Nominating and Corporate Governance Committee.

13.     ***Defendant Ira Ehrenpreis*** ("Ehrenpreis") has served as a member of the Board since May 2007.  Ehrenpreis is the Chairman of the Nominating and Corporate Governance Committee and is also a member of the Compensation Committee and Audit Committee.

14.     ***Defendant Antonio Gracias*** ("Gracias") has served as a member of the Board since May 2007.  Gracias is the Chairman of the Compensation Committee and is also a member of the Nominating and Corporate Governance Committee and Audit Committee.

15.     ***Defendant Stephen Jurvetson*** ("Jurvetson") has served as a member of the Board since June 2009.  Jurvetson is also a director of SpaceX.  As stated in the 2018 Proxy, Jurvetson

has been on a leave of absence from the Board since November 2017 and is also on a leave of absence from the SpaceX Board.

16.     **Defendant James Murdoch** ("Murdoch") has served as a member of the Board since July 2017.

17.     **Defendant Kimbal Musk** ("K. Musk") has served as a member of the Board since April 2004. K. Musk is also a director of SpaceX.   Defendant Elon Musk and Kimbal Musk are brothers.

18.     **Defendant Linda Johnson Rice** ("Rice") has served as a member of the Board since July 2017.

**Non-Party**

19.     **Non-Party Larry Ellison** ("Ellison") has served as a member of the Board since December 27, 2018.

20.     **Non-Party Kathleen Wilson-Thompson** ("Wilson-Thompson") has served as a member of the Board since December 27, 2018.

21.     Defendants Musk, Buss, Denholm, Ehrenpreis, Gracias, Jurvetson, Murdoch, K. Musk, and Rice are collectively referred to herein as the "Director Defendants".

## TESLA CORPORATE GOVERNANCE

22.     As members of Tesla's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

23.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tesla, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

24.     In Tesla's 2018 Proxy and under Corporate Governance, Tesla discusses its Investor Outreach program, stating in relevant part:

During 2014, the Board determined to formally identify, approach and establish an active dialogue with our largest stockholders and conduct an extensive review of our corporate governance practices. We inaugurated a program of periodic investor outreach to ensure that Tesla's Board and management understand and consider the issues that matter most to our stockholders. We have gradually expanded this program over time to include senior members of management and the Board, who have participated in hosting extended series of meetings with and preparing presentations to a broad base of investors. […]

Moreover, members of our Board and management have proactively sought input from our investors when considering important corporate actions that involve matters of corporate governance and alignment with stockholder interests.  […]

25.     Regarding its Code of Business Conduct and Ethics, in Tesla's 2018 Proxy and under Corporate Governance, Tesla states in relevant part:

The Board sets high standards for Tesla's employees, officers and directors. ***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company*** and managing its affairs consistent with high principles of business ethics. Accordingly, Tesla has adopted a Code of Business Conduct and Ethics, which is applicable to Tesla and its subsidiaries' directors, officers and employees.  […] [Emphasis added]

**Corporate Governance Guidelines**

26.     Tesla's Corporate Governance Guidelines, as they presently appear on its website, provide in relevant part:

**Introduction**

These Corporate Governance Guidelines are established by the Board of Directors of Tesla Motors, Inc. to provide a structure within which our directors and management can effectively pursue Tesla's objectives for the benefit of our stockholders.  […]

* * *

**Principal Duties of the Board of Directors**

To Oversee Management and Evaluate Strategy. The fundamental responsibility of the Board is to exercise their business judgment to act in what they reasonably believe to be the best interests of Tesla and its stockholders. ***It is the duty of the Board to oversee management's performance to ensure that Tesla operates in an effective, efficient and ethical manner.  Additionally, the Board has responsibility***

*for risk oversight*, with reviews of certain areas being conducted by the relevant board committees. [Emphasis added]

## Code of Business Conduct and Ethics

27.     Tesla maintains a Business Conduct and Ethics ("Code of Conduct") which indicates it was last revised on December 12, 2017.   However, this Code of Conduct (as it presently appears on Tesla's website) includes references to a "Disclosure Committee".   On information and belief, this Disclosure Committee did not exist until **after** judgment was entered in the SEC/Musk litigation and SEC/Tesla litigation (on October 16, 2018).   On information and belief, the Code of Conduct in effect during the time of the wrongful conduct as alleged herein was dramatically different from this present Code of Conduct.   This present Code of Conduct provides in relevant part:

### Introduction

*Tesla aspires to be a "do the right thing" company – in other words, engaging in conduct that your family would be proud of*. That higher principle, if followed correctly, pretty much takes care of this whole topic. That said, this Code of Business Conduct and Ethics sets out basic principles that should help anyone working at or for Tesla avoid even the appearance of improper behavior.

\* \* \*

### Compliance with Laws, Rules and Regulations

*Obeying the law, both in letter and in spirit, is the foundation on which this Company's ethical standards are built. You must respect and obey the laws of the places where we operate*. […]

\* \* \*

### Code of Ethics for CEO and Senior Financial Officers

*The above Code of Business Conduct and Ethics applies to all directors and employees of Tesla. The CEO and all senior financial officers, including the CFO and principal accounting officer, are bound by the provisions set forth therein relating to ethical conduct, conflicts of interest and compliance with law*. In addition to the Code of Business Conduct and Ethics, the CEO and senior financial officers are subject to the following additional specific policies:

(1) ***The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure*** in the periodic reports required to be filed by Tesla with the SEC. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by Tesla in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities as specified in Tesla's Disclosure Controls and Procedures Policy.

(2) ***The CEO and each senior financial officer shall promptly bring to the attention of the Disclosure Committee*** and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect Tesla's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in Tesla's financial reporting, disclosures or internal controls.

(3) The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the Legal Department or the CEO and to the Audit Committee any information he or she may have concerning any violation of Tesla's Code of Business Conduct and Ethics, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in Tesla's financial reporting, disclosures or internal controls.

(4) The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the Legal Department or the CEO and to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to Tesla and the operation of its business, by Tesla or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.

(5) The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Business Conduct and Ethics or of these additional procedures by the CEO and Tesla's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Business Conduct and Ethics and to these additional procedures, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and termination of the individual's employment. In determining what action is

appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past. [Emphasis added]

**Audit Committee Charter**

28.   Tesla maintains an Audit Committee Charter which indicates it was last modified on December 12, 2017.  This present Audit Committee Charter states that its purpose, in part, is to assist the Tesla Board in oversight of the Company's compliance with legal and regulatory compliance, and provides in relevant part:

**RESPONSIBILITIES, DUTIES AND POWERS**

The responsibilities, duties and powers of the Audit Committee shall include:

\* \* \*

***Reviewing, prior to announcement, Company press releases and other disclosures containing financial information for the purpose of ensuring that such press releases and other disclosures properly disclose financial information***.   […] [Emphasis added]

**Disclosure Controls Committee**

29.   Tesla adopted a Disclosure Controls Committee Charter on December 11, 2018, which was a requirement of the judgments entered in the SEC/Musk litigation and SEC/Tesla litigation.  On information and belief, this committee and its charter did not exist at the time of the wrongful acts as alleged herein.  This Disclosure Controls Committee Charter provides in relevant part:

**RESPONSIBILITIES, DUTIES AND POWERS**

The responsibilities, duties and powers of the Committee shall include:

- Overseeing the implementation of the terms of the consent agreement between the United States Securities and Exchange Commission and the Company dated September 29, 2018, along with the final judgment

9

incorporated therein, the "Consent";

- Reviewing compliance with the terms of the Consent and any matter relating to any purpose, responsibility, duty or power of the Committee set forth in this charter or applicable law, or delegated to the Committee by the Board, and obtaining unrestricted access to the Company's books, records and employees in furtherance of any such review;

- Overseeing the controls and processes governing the Company's and its executive officers' (as defined in Rule 3b-7 under the Securities Exchange Act of 1934) public disclosures and public statements relating to the Company, including meeting periodically with the Company's management, internal audit and legal departments, and the Company's Management Disclosure Committee to review their assessment of such disclosures;

- Serving in an advisory role and facilitating Board review regarding the Company's policies relating to the public disclosure of information relating to the Company by the Company or its personnel, including its Disclosure Controls and Procedures and the Senior Executives Communications Policy;

- Reviewing and resolving any issues related to any actual or potential conflicts of interests, compensation, employment disputes, non-compliance with the Disclosure Controls and Procedures or any other human resources matter involving any executive officer of the Company, determining the materiality of any such issues, and ensuring appropriate disclosure, if needed, in compliance with the Company's Disclosure Controls and Procedures;

- Ratifying the employment or designation of an experienced securities law attorney of the Company as Disclosure Counsel who will assist in (i) reviewing disclosures and compliance relating to the Company by the Company and its executive officers pursuant to the Company's Disclosure Controls and Procedures, Senior Executives Communications Policy and other applicable policies and procedures and (ii) advising the Company regarding securities law issues, including, but not limited to, compliance with federal securities laws and regulations; and

- Periodically reviewing and, if appropriate, recommending to the full Board amendment of the Committee's charter and processes.

## **DUTIES OF THE DIRECTOR DEFENDANTS**

30.     By reason of their positions as officers, directors, and/or fiduciaries of Tesla and because of their ability to control the business and corporate affairs of Tesla, the Director

Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Tesla in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of Tesla and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

31.     Each director and officer of the Company owes to Tesla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

32.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Tesla, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company and/or Musk.  Because of their advisory, executive, managerial and directorial positions with Tesla, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Tesla.

33.     To discharge their duties, the officers and directors of Tesla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Tesla were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company and its business prospects, and ensuring that the Company maintained an adequate system of internal controls such that the Company's public reporting would be true and accurate at all times;

(d)     remain informed as to how Tesla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

34.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tesla, the absence of good faith on their part, and a

reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

35.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other Tesla directors, officers, and/or employees to do so.  Each director and officer of the Company also owed Tesla and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

36.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, Tesla has expended, and will continue to expend, significant sums of money.

37.     The Director Defendants' actions have irreparably damaged Tesla's corporate image and goodwill.

## COMPANY BACKGROUND AND INFORMATION

### Tesla Business and Model 3 Issues and Misrepresentations

38.     Tesla is a leading designer, manufacturer and distributor of specialty vehicles and related aftermarket parts and services.  Its vehicle product line is the Model S (introduced in 2012), Model X (introduced in 2015), and Model 3 (introduced in 2017).

39.     As discussed in a November 30, 2017 *Forbes* article entitled *Tesla's Production Problems Are The Company's Achilles' Heel*, ". . . the process of making a car is actually very similar around the world.  Simply put, automakers attempt to make as many cars as possible, and the highest correlation with margins is found in a basic metric: linespeed.  Any time the line stops, profits are being wasted . . . ."

13

40.     Both Tesla's Model S and Model X have had production problems.  As detailed in a November 29, 2017 *Reuter*'s article entitled *Build Fast, Fix Later: Speed Hurts Quality at Tesla, Some Workers Say*, vehicle quality checks have disclosed defects in more than 90% of Model S and Model X vehicles inspected after assembly, with these problems being seen ". . . as far back as 2012."  The *Reuters* article states in relevant part:

> Auto industry experts say the company's [Tesla's] survival now depends on its ability to crank out high-quality cars in volume as it begins to build its first mass-market car, the Model 3, which starts at $35,000.
>
> * * *
>
> "We've never doubted Tesla's ability to make exciting products with top specifications, but there's a difference between unveiling something and then actually making it perfectly in large volume. Tesla has not perfected the latter yet," Morningstar analyst David Whiston wrote earlier this month.
>
> * * *
>
> Snags are normal with any new launch. But chronic defects with Tesla's established Models S and X show a company still struggling to master basic manufacturing, workers said.
>
> Known as "kickbacks" within Tesla, these vehicles have glitches as minor as dents and scratches to more complex troubles such as malfunctioning seats. Easy fixes are made swiftly on the factory floor, workers said.
>
> Trickier cases head to one of Tesla's outdoor parking lots to await repair. The backlog in one of those two lots, dubbed the "yard," has exceeded 2,000 vehicles at times, workers told Reuters.
>
> * * *
>
> Reuters interviewed nine current and former Tesla employees, including a former senior manager, with experience in assembly, quality control and repairs on Model S and Model X. All requested anonymity because the company required them to sign non-disclosure agreements.
>
> * * *
>
> Employees who worked on Model S and Model X described pressure to keep the assembly line moving, even when problems emerged.

* * *

Some workers traced the challenges to Musk's determination to launch vehicles faster than the industry norm by shortening the design process, skipping some pre-production testing, then making improvements on the fly. Such improvisation leads to high repair rates, employees said.

41.     During this time, Tesla was representing that it would soon reach production levels of 5000 Model 3 cars per week, even though it had just completed **its first** Model 3 production vehicle as of September 30, 2017.  For example:

    (a)     In its Form 10-Q filed with the SEC on November 3, 2017 and after acknowledging that ". . . Model 3 production in the third quarter of 2017 was less than anticipated . . .", Tesla stated "[w]e are growing our vehicle manufacturing capacity primarily to fulfill Model 3 production at 5,000 vehicles per week and in a later phase to 10,000 vehicles per week;

    (b)     In its Third Quarter 2017 Update Letter Tesla stated, "[w]e believe that we are well capitalized to accommodate the revised ramp of Model 3 production to 5,000 per week.

42.     Tesla's and Musk's misrepresentations and false promises about Model 3 production led to an investigation by the SEC and the commencement of various class action lawsuits including *Wochos v. Tesla, Inc., et al.*, Case No. 3:17-cv-05828-CRB (N.D. CA) (the "Wochos Action").

43.     In 2016 Tesla disclosed concrete plans to market and sell the Model 3 automobile. As recounted in the Wochos Action:

•     From the time of Defendants' 2016 disclosure of plans to produce the Model 3, Defendants told investors that they had learned from their previous mistakes, and that Model 3 production would be different. (¶ 82);

- During the May 4, 2016 Conference Call, Tesla told investors it anticipated Model 3 sales of approximately 300,000-400,000 in 2018, increasing materially thereafter. At those numbers, Tesla would produce and deliver between 5,769-7,692 Model 3s per week in 2018, so Defendants were announcing to the market at this early date that they intended to mass produce the Model 3 before the end of 2017. (¶ 86);

- Mass producing the Model 3 before the end of 2017 was critical to Tesla. One March 12, 2018 *Bloomberg* article stated that "[t]he Model 3 production rate is of existential importance to Tesla." These pressures motivated Defendants to mislead investors during the Class Period to preserve Tesla's stock price and its ability to raise money to fund operations. (¶ 103);

- At no point in May 2017 did Musk or the other Defendants even hint that preparations for mass production of the Model 3 by the end of 2017 were lagging behind their own production plan, or otherwise of concern. (¶ 121);

- On August 2, 2017, Tesla filed with the SEC "Tesla Second Quarter 2017 Update" as Exhibit 99.1 to an 8-K. Defendants Musk and Ahuja signed the Update. Directly referencing actual facts on the ground with respect to completion of the automated line meant to produce the Model 3, a line which was supposedly already producing cars, the Company stated, based on current production line advancement, that: Based on our preparedness at this time, we are confident we can produce just over 1,500 vehicles in Q3, and achieve a run rate of 5,000 vehicles per week by the end of 2017. (¶ 127)

- Sometime in late April or early May of 2016, [Former Employee ("FE")] 1 participated in a meeting with Musk, CFO Jason Wheeler, and the Vice President of Engineering. FE1 stated that during that meeting, he told Musk directly that

there was zero chance that the plant would be able to produce 5,000 Model 3s per week by the end of 2017. (¶ 140);

- FE1 stated that there were many reasons why Tesla would never be able to produce 5,000 Model 3s per week by the end of 2017, all known as of April or May of 2016.  As of FE1's departure in June 2016, Tesla did not yet even have a finalized design for the Model 3, so Tesla could not release information so molds for body parts could be built. Molds take from 9-12 months to make.  (¶ 141);

- During the July 28, 2017 "handover" event, televised online, where Tesla "handed over" the first 30 Model 3s to buyers, Defendant Musk stated that "there's actually a total of 50 production cars that we made this month . . . ." (¶ 256);

- The foregoing was false and misleading because, as described in detail above, Defendants knew or were reckless in not knowing that:

   o   The 50 Model 3s at the handover event were not "production cars," *i.e.*, identical cars built on an automated line, but rather were built by hand, and the batteries in all 50 Model 3s were also built by hand;

   o   Contrary to Musk's clear statement by using the term "production cars" at the handover event, automated production of Model 3s had not yet begun, thus Tesla had missed its own July, 2017 production plan for beginning automated production of the Model 3, and would not be able to mass produce the Model 3 in 2017, and could not achieve mass production until March 2018, at the earliest;

   o   There were no fully functioning automated lines to produce the sufficient numbers of Model 3 car bodies in Fremont for mass production, or fully functioning automated lines to produce sufficient batteries for mass production in the Gigafactory;

   o   Preparations at the Fremont and Nevada production facilities were woefully short of being on track to support mass production of the Model 3 in 2017, much less production of 5,000 Model 3s a week at any time in 2017. (¶ 257).

**Musk's Other and Related Businesses**

44.     SpaceX is a private American aerospace manufacturer and space transportation services company.  It was founded in 2002 by Musk.  Musk, through the Elon Musk Trust, has voting control of more than 75% of SpaceX stock.

45.     SolarCity was founded in 2006 by brothers Peter and Lyndon Rive, who are Musk's cousins.  Musk is the chairman of SolarCity and helped start the company.  SolarCity's founding vision is to accelerate mass adoption of sustainable energy.  Per its Form DEF 14A filed with the SEC on April 21, 2016, prior to SolarCity's acquisition by Tesla, Musk owned approximately 22.2% of SolarCity shares.

46.     The overlap of these three companies (Tesla, SpaceX, and SolarCity), Musk, and some of his directors and investors is summarized in the following figure[1]:

---

[1]     *See* "A Deep Dive into Elon Musk's Investments: The Makings of a Billionaire", at https://www.toptal.com/finance/venture-capital-consultants/elon-musks-investments

Map of Personal Connections Between Musk's Companies



Source: Wall Street Journal

47.     As recounted in *In Re Tesla Motors, Inc. Stockholder Litig.*, C.A. No. 12711-VCS (DE Ch.):

> Musk himself has publically stated that: (1) Tesla, SolarCity and SpaceX form a "pyramid" on top of which he sits, and that it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid . . . falters"; and (2) Tesla is "his company".

48.     PayPal has Musk ties as well.  In March 1999, Musk co-founded X.com, an online financial services and e-mail payment company.  In 2000 X.com merged with Confinity, which had a money-transfer service called PayPal. The merged company focused on the PayPal service and was renamed PayPal in 2001.  Musk was a member of PayPal's Board of Directors.  In October 2002, PayPal was acquired by eBay for $1.5 billion in stock, of which Musk received US$165 million. Before its sale to eBay, Musk, owned 11.7% of PayPal's shares and was the company's largest shareholder.

**Musk Twitter Use and Tesla Historical Representations Re: Its Oversight**

49.     Elon Musk is a co-founder of Tesla and its figurehead.  He has served as its CEO since October 2008 and as Chairman of the Board since April 2004.  As more fully discussed herein, as a result of his wrongful conduct, Musk recently relinquished his Chairman position but remains a director of Tesla.

50.     On information and belief, in 2009, Musk created a profile on the social media application Twitter (twitter.com/elonmusk). Since that time, Musk often used Twitter to communicate about Tesla's business (referred to as "posting a tweet" or "tweeting").

51.     Tesla maintains that Musk's Twitter account is one of the forms of communication Tesla relies on to share Company news.  On November 5, 2013, Tesla filed a Form 8-K with the SEC announcing its financial results for the quarter ended September 30, 2013.  This Form 8-K included an additional "Other Event" where Tesla stated:

Tesla Disclosure Channels To Disseminate Information

Tesla investors and others should note that ***we announce material information to the public about our company, products and services and other issues through a variety of means, including Tesla's website, press releases, SEC filings, blogs and social media***, in order to achieve broad, non-exclusionary distribution of information to the public. We encourage our investors and others to review the information we make public in the locations below as such information could be deemed to be material information. Please note that this list may be updated from time to time.

**Interested in keeping up with Tesla?**

For more information on Tesla and its products, please visit: teslamotors.com

For more information for Tesla investors, please visit: ir.teslamotors.com

For the latest information from Tesla, including press releases and the Tesla blog, please visit: teslamotors.com/press

For additional information, ***please follow Elon Musk's and Tesla's Twitter accounts: twitter.com/elonmusk*** and twitter.com/TeslaMotors
[Emphasis added].

52.     As alleged in the Tesla/SEC Complaint, "[s]ince November 2013, Musk has used his Twitter account to publish material information about Tesla.   For example, Musk has published forward-looking guidance regarding Tesla's financial metrics via Twitter.   Musk has also used Twitter to disclose key non-financial information about Tesla, including production forecasts, production achievements, and new product releases.   Tesla's Chief Financial Officer (CFO) described Musk's Twitter statements as a "strong channel of marketing" with Musk acting as a "spokesman" for Tesla."

53.     On April 24, 2014, Tesla filed its Form DEF 14A filed with the SEC (the "2014 Proxy Statement") which gave notice of the Annual Meeting of Stockholders to be held on June 3, 2014.  The stated agenda for this meeting was to (a) elect certain directors to the Board; (b) hold a non-binding vote on executive compensation; (c) approve an amendment to the Tesla Equity Incentive Plan; (d) ratify the appointment of the independent accounting firm; and (e) consider and vote upon a shareholder proposal regarding supermajority stockholder voting provisions.

54.     Regarding corporate governance and its Code of Conduct, in the 2014 Proxy Statement, Tesla represented that "***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics***." [Emphasis added]

55.     Regarding the Board's role in risk oversight, in the 2014 Proxy Statement, Tesla represented that:

***The Board of Directors is responsible for overseeing the major risks facing the Company*** while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis.  In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees. The Audit Committee reviews and discusses with management significant financial and nonfinancial risk exposures and the steps management has taken to monitor, control and report such exposures. The Compensation Committee oversees management of risks relating to the Company's compensation plans and programs. In performing their oversight responsibilities, the Board and Audit Committee periodically discuss with management the Company's policies with respect to risk assessment and risk management. The Audit and Compensation Committees report to the Board as appropriate on matters that involve specific areas of risk that each Committee oversees. [Emphasis added]

56.     On April 22, 2015, Tesla filed its Form DEF 14A filed with the SEC (the "2015 Proxy Statement") which gave notice of the Annual Meeting of Stockholders to be held on June 9, 2015.  The stated agenda for this meeting was to (1) elect certain directors to the Board; (2) ratify the appointment of the independent accounting firm; and (3) consider and vote upon two separate shareholder proposals.

57.     Regarding corporate governance, in the 2015 Proxy Statement, Tesla informed the investing public that about its "new" Investor Outreach program.  Regarding Investor Outreach, Tesla stated:

> During the last fiscal year, Tesla's Board of Directors determined to formally establish an active dialogue with our largest stockholders and conduct an extensive review of our corporate governance practices. We inaugurated a program of investor outreach to ensure that Tesla's Board of Directors and management understand and consider the issues that matter most to our stockholders. Through this program, we received helpful input regarding a number of stockholder-related matters.
>
> We do not expect that we will always be able to address all of our stockholders' feedback.  However, we seek to optimize our corporate governance by continually refining our relevant policies, procedures and practices to align the needs of the company with evolving regulations and best practices, issues raised by our stockholders, and otherwise as circumstances warrant.  Taking into account such considerations, the Board of Directors, with the full recommendation of the Nominating and Corporate Governance Committee, adopted a number of significant changes to our corporate governance practices. These aspects of our corporate governance, which are described in more detail elsewhere in this proxy statement, are as follows:

- We have adopted and posted to our website our Corporate Governance Guidelines, which provide for, among other things:

  - The Chief Executive Officer and non-executive members of the Board of Directors to be subject to significant minimum stock ownership thresholds;

  - Our named executive officers to be subject to minimum vesting periods for time-based vesting equity awards and minimum holding periods for vested equity awards; and

  - Our executive officers to be subject to a clawback policy relating to the repayment of certain incentives if there is a restatement of our financial statements.

- Members of the Board of Directors are elected by a majority standard in uncontested elections.

- The Tesla Motors, Inc. 2010 Equity Incentive Plan (the "2010 Plan") provides that Tesla will generally not take certain actions with the effect or purpose of repricing equity awards issued under the 2010 Plan

58.     Regarding its Code of Conduct, in the 2015 Proxy Statement, Tesla represented that "***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics***." [Emphasis added]

59.     Regarding the Board's role in risk oversight, in the 2015 Proxy Statement, Tesla represented that:

> ***The Board of Directors is responsible for overseeing the major risks facing the Company*** while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis. In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees. The Audit Committee reviews and discusses with management significant financial and nonfinancial risk exposures and the steps management has taken to monitor, control and report such exposures. The Compensation Committee oversees management of risks relating to the Company's compensation plans and programs. In performing their oversight responsibilities, the Board and Audit Committee periodically discuss with management the Company's policies with respect to risk assessment and risk management. The Audit and Compensation Committees report to the Board as appropriate on matters that involve specific areas of risk that each Committee oversees. [Emphasis added]

60.     On April 15, 2016, Tesla filed its Form DEF 14A filed with the SEC (the "2016 Proxy Statement") which gave notice of the Annual Meeting of Stockholders to be held on May 31, 2016.  The stated agenda for this meeting was to (1) elect certain directors to the Board; (2) ratify the appointment of the independent accounting firm; and (3) consider and vote upon a shareholder proposal to eliminate limited supermajority stockholder requirements.

61.     Regarding corporate governance and its Investor Outreach program, in the 2016 Proxy Statement, Tesla stated:

> During 2014, the Board of Directors determined to identify, approach and formally establish an active dialogue with our largest stockholders and conduct an extensive review of our corporate governance practices. We inaugurated a program of periodic investor outreach to ensure that Tesla's Board of Directors and management understand and consider the issues that matter most to our stockholders. Through this program and since its commencement, we received and continue to periodically receive helpful input regarding a number of stockholder-related matters, and have adopted a number of significant changes to our corporate governance practices.

> We do not expect that we will always be able to address all of our stockholders' feedback. However, we seek to optimize our corporate governance by continually refining our relevant policies, procedures and practices to align the needs of the Company with evolving regulations and best practices, issues raised by our stockholders, and otherwise as circumstances warrant.

62.     Regarding its Code of Conduct, in the 2016 Proxy Statement Tesla represented that "***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics***." [Emphasis added]

63.     Regarding the Board's role in risk oversight, in the 2016 Proxy Statement, Tesla represented that:

> ***The Board of Directors is responsible for overseeing the major risks facing the Company*** while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis. In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees. The Audit Committee reviews and discusses with management significant financial and nonfinancial risk exposures and the steps management has taken to monitor, control and report such exposures. The Compensation Committee oversees

24

management of risks relating to the Company's compensation plans and programs. In performing their oversight responsibilities, the Board and Audit Committee periodically discuss with management the Company's policies with respect to risk assessment and risk management. The Audit and Compensation Committees report to the Board as appropriate on matters that involve specific areas of risk that each Committee oversees. [Emphasis added].

64.     On April 20, 2017 Tesla filed its Form DEF 14A filed with the SEC (the "2017 Proxy Statement") which gave notice of the Annual Meeting of Stockholders to be held on June 7, 2017. The stated agenda for this meeting was to (1) elect certain directors to the Board; (2) hold a non-binding vote on executive compensation; (3) hold a non-binding vote on the frequency of executive compensation votes; (4) ratify the appointment of the independent accounting firm; and (5) consider and vote upon a shareholder proposal to declassify the Board of Directors.

65.     Regarding corporate governance and its Investor Outreach program, in the 2017 Proxy Statement, Tesla stated:

> During 2014, the Board of Directors determined to formally identify, approach and establish an active dialogue with our largest stockholders and conduct an extensive review of our corporate governance practices. We inaugurated a program of periodic investor outreach to ensure that Tesla's Board of Directors and management understand and consider the issues that matter most to our stockholders. We have gradually expanded this program over time. Most recently, senior members of management and members of the Board of Directors have directly participated, and we expect that they will participate in the future, in hosting extended series of meetings with and preparing presentations to a broad base of investors regarding both general and Tesla-specific corporate governance topics. For example, in early 2017, senior members of management and our Lead Independent Director, Antonio Gracias, held meetings with more than 85% of our top 15 institutional investors, during which senior management and Mr. Gracias obtained feedback from our investors and also presented on a variety of issues, including Tesla's Board of Directors process, Mr. Gracias's role as Lead Independent Director, and the intention of the Board of Directors to add new independent directors to the Board of Directors in the near future. Through this program, we have received and continue to periodically receive helpful input regarding a number of stockholder-related matters, and have adopted a number of significant changes to our corporate governance practices.

> We do not expect that we will always be able to address all of our stockholders' feedback. However, we seek to optimize our corporate governance by continually refining our relevant policies, procedures and practices to align the needs of the

Company with evolving regulations and best practices, issues raised by our stockholders, and otherwise as circumstances warrant.

66.     Regarding its Code of Conduct, in the 2017 Proxy Statement, Tesla represented that "***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics***." [Emphasis added]

67.     Regarding the Board's role in risk oversight, in the 2017 Proxy Statement, Tesla represented that:

> ***The Board of Directors is responsible for overseeing the major risks facing the Company*** while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis. In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees. The Audit Committee reviews and discusses with management significant financial and nonfinancial risk exposures and the steps management has taken to monitor, control and report such exposures. The Compensation Committee oversees management of risks relating to the Company's compensation plans and programs. In performing their oversight responsibilities, the Board and Audit Committee periodically discuss with management the Company's policies with respect to risk assessment and risk management.  The Audit and Compensation Committees report to the Board as appropriate on matters that involve specific areas of risk that each Committee oversees. [Emphasis added].

68.     On February 8, 2018, Tesla filed its Form DEF 14A filed with the SEC (the "2018 Special Proxy Statement") which gave notice of a Special Meeting of Stockholders to be held on March 21, 2018.  The stated agenda for this meeting was a single matter; to consider and vote on a proposal to approve the grant of a stock option award (the "CEO Performance Award") to Musk. The 2018 Special Proxy Statement further stated that on January 21, 2018, the Tesla Board (except Musk and K. Musk) ". . . determined that the grant of the CEO Performance Award was fair [], advisable and in the best interests of Tesla and its stockholders."

69.     In the 2018 Special Proxy Statement, Tesla discussed the background of the previous CEO performance award structure and outcomes.  It also discussed and described its planned new CEO Performance Award, stating in relevant part:

> As Tesla continues to grow, we have created a new 10-year performance award for Elon that incentivizes him to not only continue to lead Tesla over the long-term, but to help the company achieve these great goals. […]
>
> Elon will receive no guaranteed compensation of any kind — no salary, no cash bonuses, and no equity that vests by the passage of time. Instead, Elon's only compensation will be a 100% at-risk performance award, which ensures that he will be compensated only if Tesla and all of our stockholders do extraordinarily well.

70.     The 2018 Special Proxy Statement includes a discussion of Tesla's Clawback Policy, which it described as limited to circumstances requiring a restatement of Tesla's financial statements.  The proposed CEO Performance Award and the 2018 Special Proxy Statement is otherwise silent on CEO bad acts which may enhance Tesla stock performance (for example, the bad acts as alleged herein) and how such CEO conduct could/should impact any CEO Performance Award.

71.     On April 26, 2018, Tesla filed its 2018 Proxy Statement which gave notice of the Annual Meeting of Stockholders to be held on June 5, 2018.  The stated agenda for this meeting was to (1) elect certain directors to the Board; (2) ratify the appointment of the independent accounting firm; (3) consider and vote upon a shareholder proposal to require that the Chair of the Board be an independent director; and (4) consider and vote upon a shareholder proposal regarding proxy access.

72.     Regarding corporate governance and its Investor Outreach program, in the 2018 Proxy Statement, Tesla stated:

> During 2014, the Board determined to formally identify, approach and establish an active dialogue with our largest stockholders and conduct an extensive review of our corporate governance practices. We inaugurated a program of periodic investor outreach to ensure that Tesla's Board and management understand and consider the issues that matter most to our stockholders. We have gradually expanded this program over time to include senior members of management and the Board, who have participated in hosting extended series of meetings with and preparing presentations to a broad base of investors.  For example, in 2017, such meetings were held with many of our largest institutional investors to obtain investor feedback and present on a variety of corporate governance issues, including the role and number of independent directors on the Board. Through this program, we have received and continue to periodically receive helpful input regarding a number of

stockholder-related matters, and have adopted a number of significant changes to our corporate governance practices in addition to welcoming two new independent directors to our Board in 2017, bringing the total number of independent directors to seven of nine members.

Moreover, members of our Board and management have proactively sought input from our investors when considering important corporate actions that involve matters of corporate governance and alignment with stockholder interests. For example, at the request of the Compensation Committee, Ira Ehrenpreis and our General Counsel, Todd Maron, had calls in 2017 with 15 of our largest institutional stockholders to discuss and solicit their views regarding Elon Musk's compensation arrangements. As the Board thereafter deliberated for several months on a new performance award for Mr. Musk, it gave great weight to the feedback that our stockholders provided during these early calls, and it incorporated much of that feedback into the ultimate design of the award, culminating in the grant of a performance-based stock option award to Mr. Musk in January 2018 (the "2018 CEO Performance Award") that was subsequently approved by approximately 73% of the votes cast by stockholders (other than Mr. Musk or Kimbal Musk) at a meeting to approve such award.

We do not expect that we will always be able to address all of our stockholders' feedback. However, we seek to optimize our corporate governance by continually refining our relevant policies, procedures and practices to align the needs of the Company with evolving regulations and best practices, issues raised by our stockholders, and other factors as circumstances warrant.

73.    Regarding its Code of Conduct, in the 2018 Proxy Statement, Tesla represented that "***Tesla is committed to establishing an operating framework that exercises appropriate oversight of responsibilities at all levels throughout the company and managing its affairs consistent with high principles of business ethics***." [Emphasis added]

74.    Regarding the Board's role in risk oversight, the language contained in the 2018 Proxy Statement was changed without explanation and for the first time in years.  In the 2018 Proxy Statement, Tesla's statements regarding the Board's role in risk oversight was now limited to:

The Board is responsible for overseeing the major risks facing the Company while management is responsible for assessing and mitigating the Company's risks on a day-to-day basis. In addition, the Board has delegated oversight of certain categories of risk to the Audit and Compensation Committees, which are comprised entirely of independent directors. The Audit and Compensation Committees report to the Board

28

as appropriate on matters that involve specific areas of risk that each Committee oversees.

75.     For the first time in a Proxy Statement, Tesla added a new subsection under its discussion of risk oversight entitled "Financial, Compliance, and Control Risks", which provided:

> The Audit Committee has scheduled quarterly and annual reviews and discussions with management regarding significant risk exposures and incident metrics, including those relating to financial, accounting and treasury matters, internal audit and controls, legal and regulatory compliance, and data privacy and cybersecurity. These discussions cover the steps management has taken to monitor, control and report such exposures, as well as Tesla's policies with respect to risk assessment and risk management.

76.     Notwithstanding the Company's representations in its various Proxy Statements, the Director Defendants knew, should have known, and/or were reckless in disregarding Musk's history of making false and/or misleading statements such as:

- Musk made unfounded claims that Vernon Unsworth, a British spelunker who assisted in the rescue of a group of Thai youth trapped in a cave, is a pedophile;

- On April 1, 2018, Musk tweeted that Tesla was bankrupt, and posted a picture of himself with a caption that included, "Elon was found passed out against a Tesla Model 3, surrounded by 'Teslaquilla' bottles, the tracks of dried tears still visible on his cheeks", at a time that the Company was rumored to have solvency issues, to make an "April fool's joke";

- Musk's statements related to Model 3 production volume and issues with the production process (as partly described above and more fully set forth in the Wochos Action).

- June 17, 2018, E. Musk tweeted that short sellers "have about three weeks before their short position explodes."

**Pre-August 7, 2018 Discussions Re: Taking Tesla Private**

77.     Beginning in January 2017, Musk had three or four in-person meetings with representatives of a sovereign investment fund (the "Fund"). During these meetings, according to

Musk, the lead representative of the Fund expressed a verbal desire to make a large investment in Tesla and establish a Tesla production facility in the Middle East.

78.     In late July 2018, Musk and representatives of the Fund had not spoken for many months. On July 28, 2018, a representative of the Fund requested a meeting with Musk.  On the evening of July 31, Musk and his chief of staff met with three representatives of the Fund at Tesla's factory in Fremont, California for approximately 30 to 45 minutes. Tesla's CFO joined midway through the meeting.

79.     According to Musk, at the meeting the Fund's lead representative told Musk that the Fund had recently acquired almost five percent of Tesla's common stock on the open market, expressed interest in taking Tesla private, and confirmed that he was empowered to make investment decisions for the Fund. Musk later stated that he assumed without confirming that the lead Fund representative was proposing a "standard" going-private transaction, but the terms of any such deal were not discussed.

80.     During the July 31 meeting, the lead Fund representative again raised the prospect of establishing a production facility in the Middle East. According to Musk, he expressed openness but made no commitment; Musk assumed that whether a Tesla production facility in the Middle East was a precondition to the Fund's willingness to take Tesla private would depend on the amount of capital the Fund was required to commit to the transaction.  Musk did not discuss his assumption with the representatives of the Fund.

81.     The July 31 meeting lacked discussion of even the most fundamental terms of a proposed going-private transaction.  For example, there was no discussion at the July 31 meeting of (1) any dollar amount or specific ownership percentage for the Fund's investment in a going-private transaction; (2) any acquisition premium to be offered to current Tesla shareholders; (3) any restrictions on foreign ownership of a significant stake in Tesla; (4) the Fund's available liquid capital; (5) whether the Fund had any past experience participating in a going-private transaction; (6) any regulatory hurdles to completion of a going-private transaction; or (7) the

30

board approval process necessary to take Tesla private. Musk has acknowledged that the July 31 meeting was the most specific discussion of a transaction to take Tesla private between him and representatives of the Fund.

82.     According to Musk, at the close of the July 31 meeting, the lead representative of the Fund asked Musk to tell the Fund how he wanted to do a going-private transaction and represented that so long as the terms were "reasonable," the Fund would be fine with them. Musk acknowledged that no specific deal terms had been established at the meeting and that there was no discussion of what would or would not be considered reasonable. Nothing was exchanged in writing, and there was no discussion of confidentiality. Musk did not communicate with representatives of the Fund again about a going-private transaction until August 10, three days after his August 7 statements.

83.     On August 2, 2018, after market close, Musk sent an email with the subject, "Offer to Take Tesla Private at $420," to Tesla's Board of Directors, Chief Financial Officer, and General Counsel.  In the email, Musk explained his reasons for wanting to take Tesla private, including that being public "[s]ubjects Tesla to constant defamatory attacks by the short-selling community, resulting in great harm to our valuable brand." In the email, Musk asked that the "matter be put to a shareholder vote at the earliest opportunity" and stated that the "offer expires in 30 days."

84.     According to Musk, he calculated the $420 price per share based on a 20% premium over that day's closing share price because he thought 20% was a "standard premium" in going-private transactions. This calculation resulted in a price of $419, and Musk stated that he rounded the price up to $420 because he had recently learned about the number's significance in marijuana culture and thought his girlfriend "would find it funny, which admittedly is not a great reason to pick a price."

85.     According to Musk, he thought that there was "a lot of uncertainty" regarding a potential going-private transaction at the time of his August 2 email to Tesla's board, "but it was

worth investigating." He believed at the time that the likelihood of consummation of a transaction was about 50%.

86.     In response to Musk's August 2 email about taking Tesla private, Tesla's board held a telephonic meeting with Musk on the night of August 3. During that call, Musk informed the Board that the Fund was interested in funding a going-private transaction.

87.     Musk also told board members that he wanted existing investors to stay with the company. According to Musk, at least one board member told him that it would be "really difficult for small investors" to remain shareholders in a private Tesla.

88.     During the August 3 call, Musk told the board that he wanted to contact existing shareholders to assess their interest in participating in a going-private transaction. The board authorized Musk to contact certain investors and asked him to report back to the board on those conversations.

## FALSE AND MISLEADING STATEMENTS

89.     On information and belief, by August 2018, Musk was "followed" on Twitter by over 22 million people, including members of the press.

90.     On August 7, 2018, Musk published many statements on his Musk Twitter Account (referred to as "posting a tweet" or "tweeting") about his plans to take Tesla private. There were public and Tesla reactions posted and otherwise communicated during this time. The events that transpired are summarized as follows[2]:

(1)    **12:48 PM EDT** - Musk posted a tweet, "Am considering taking Tesla private at $420. Funding secured."

(2)    1:00 PM EDT - Tesla's head of Investor Relations sent a text to Musk's chief of staff asking, "Was this text legit?"

---

[2]      All listed times are approximate. Musk tweets and other Musk communications are identified by the listed time appearing in **bold** font.

(3)     **1:15 PM EDT** - Musk responded to another Twitter user's question, "At what price?" by responding "420."

(4)     1:23 PM EDT - Tesla's Chief Financial Officer sent a text message to Musk, "Elon, am sure you have thought about a broader communication on your rationale and structure to employees and potential investors. Would it help if [Tesla's head of communications], [Tesla's General Counsel], and I draft a blog post or employee email for you?" Musk replied, "Yeah, that would be great." Tesla's Chief Financial Officer then responded, "Working on it. Will send you shortly."

(5)     1:32 PM EDT – a business reporter texted Musk's chief of staff, "Quite a tweet! (Is it a joke?)."

(6)     **1:40 PM EDT** - Musk tweeted, "I don't have a controlling vote now & wouldn't expect any shareholder to have one if we go private. I won't be selling in either scenario."

(7)     **2:00 PM EDT** - Musk posted a tweet, "My hope is *all* current investors remain with Tesla even if we're private. Would create special purpose fund enabling anyone to stay with Tesla. Already do this with Fidelity's SpaceX [a privately held company for which Musk serves as CEO] investment."  In response to this tweet another Twitter user asked, "Could we still invest once private?" Musk responded, "Yes, but liquidity events would be limited to every 6 months or so (like SpaceX)."

(8)     **2:07 PM EDT** - Musk replied to a Twitter user who suggested, "Or if you do take Tesla private, please have a provision for retail investors who have held Tesla shares prior to Dec 31, 2016 that those shares will be converted into private shares in the new private company…." by posting a tweet, "Absolutely. Am super appreciative of Tesla shareholders. Will ensure their prosperity in any scenario."

(9)     2:08 PM EDT - Nasdaq halted trading in TSLA shares.

- Nasdaq rules require listed companies (*e.g.*, Tesla) to notify Nasdaq at least ten minutes prior to publicly releasing material information about corporate events like a proposed going-private action.  Musk did not notify Nasdaq prior to posting his August 7, 2018 tweets.

(10)  **2:13 PM EDT** - Musk posted a tweet, "Shareholders could either to [sic] at 420 or hold shares & go private."

(11)  2:23 PM EDT - another reporter sent Musk an email with the subject, "Are you just messing around?" and wrote, "Reaching out to see what's going on with your tweets about taking the company private?  Is this just a 420 joke gone awry?  Are you serious?  It seems like you are dancing into some pretty tricky legal territory by messing about with the markets this way.   Is there an actual explanation coming?"

(12)  **3:07 PM EDT** - Musk replied to a Twitter user's comment about a "forced buyout" by posting a tweet, "Def. no forced sales. Hope all shareholders remain. Will be way smoother & less disruptive as a private company. Ends negative propaganda from shorts." Later that day, Musk "retweeted" this statement, causing it to be published again in his Twitter feed.

(13)  **3:16 PM EDT** - Musk sent an email to Tesla employees. The content of that email, entitled "Taking Tesla Private," was posted on a publicly available Tesla blog at 3:32 PM EDT.  In the email and blog post, Musk explained his reasons for wanting to take Tesla private, including asserting that TSLA was "the most shorted stock in the history of the stock market" and stating that "being public means there are large numbers of people who have incentive to attack the company."  A copy of this email and blog is attached hereto as Exhibit A.

(14)  **3:36 PM EDT** - Musk posted a tweet that stated, "Investor support is confirmed. Only reason why this is not certain is that it's contingent on a shareholder vote",

and included a link to the Taking Tesla Private blog post. Neither Musk's tweet nor the blog post provided any further information or context about the meaning of Musk's statement, "Investor support confirmed," or disclosed any contingencies other than a shareholder vote that would have to be satisfied in order to take Tesla private.

(15)   3:45 PM EDT - Nasdaq lifted the trading halt on Tesla shares. After trading resumed, Tesla's stock price continued to rise, closing at $379.57, up over 6% from the time Musk first tweeted about taking Tesla private earlier that day.

(16)   5:09 PM EDT - an investment bank research analyst emailed Tesla's head of Investor Relations, "In the tweet, he said financing is secured but in the letter he doesn't address this.  Can you clarify?"  Tesla's head of Investor Relations responded approximately ten minutes later, "I can only say that the first Tweet clearly stated that 'financing is secured'. Yes, there is a firm offer."

(17)   5:23 PM EDT - another research analyst emailed Tesla's head of Investor Relations and another Investor Relations employee, "Had some questions/clarifications on today's news and blog post. Can either of you speak?" A few minutes later, Tesla's head of Investor Relations responded, "[A]part from what has been tweeted and what was written in a blog post, we can't add anything else. I only wanted to stress that Elon's first tweet, which mentioned 'financing secured' is correct."

91.   The above statements from Musk were false and misleading when made because (a) a final determination to take Tesla private, if at all, had not been made by Tesla and the Director Defendants; and (b) funding for a going private transaction had not been secured.

### THE TRUTH BEGINS TO EMERGE

92.   On August 8, 2018, Tesla published a press release relating to Musk's August 7,

2018 posts and other communications.  In this press release, Tesla stated:

> **Statement from the following members of Tesla's Board of Directors: Brad Buss, Robyn Denholm, Ira Ehrenpreis, Antonio Gracias, Linda Johnson Rice, and James Murdoch**
>
> PALO ALTO, Calif., Aug. 08, 2018 (GLOBE NEWSWIRE) -- Last week, Elon opened a discussion with the board about taking the company private. This included discussion as to how being private could better serve Tesla's long-term interests, and also addressed the funding for this to occur. The board has met several times over the last week and is taking the appropriate next steps to evaluate this.

93.     On August 8, 2018, and on this news, Tesla stock closed at $370.34 per share, a decline of 2.5% from its August 7, 2018 closing price of $379.59.

94.     On August 8, 2018, and after the market closed, *The Wall Street Journal* reported that the SEC had started an investigation into whether Musk ". . . had a factual basis for tweeting Tuesday [August 7, 2018] that the going private transaction was all but certain . . . ."

95.     On August 9, 2018, and on this news, Tesla stock closed at $352.45 per share, a decline of 5% from its August 8, 2018 closing price of $370.34.

96.     On August 10, 2018, Musk posted a tweet, "Short shorts coming soon to Tesla merch[andise]."

97.     On August 13, 2018, Musk added a post on Tesla's blog entitled "Update on Taking Tesla Private", which stated:

> **Update on Taking Tesla Private**
>
> Elon Musk August 13, 2018
>
> As I announced last Tuesday, I'm considering taking Tesla private because I believe it could be good for our shareholders, enable Tesla to operate at its best, and advance our mission of accelerating the transition to sustainable energy.  As I continue to consider this, I want to answer some of the questions that have been asked since last Tuesday.
>
> **What has happened so far?**
>
> On August 2nd, I notified the Tesla board that, in my personal capacity, I wanted to take Tesla private at $420 per share. This was a 20% premium over the ~$350 then

current share price (which already reflected a ~16% increase in the price since just prior to announcing Q2 earnings on August 1st). My proposal was based on using a structure where any existing shareholder who wished to remain as a shareholder in a private Tesla could do so, with the $420 per share buyout used only for shareholders that preferred that option.

After an initial meeting of the board's outside directors to discuss my proposal (I did not participate, nor did Kimbal), a full board meeting was held. During that meeting, I told the board about the funding discussions that had taken place (more on that below) and I explained why this could be in Tesla's long-term interest.

At the end of that meeting, it was agreed that as a next step, I would reach out to some of Tesla's largest shareholders. Our largest investors have been extremely supportive of Tesla over the years, and understanding whether they had the ability and desire to remain as shareholders in a private Tesla is of critical importance to me. They are the ones who believed in Tesla when no one else did and they are the ones who most believe in our future. I told the board that I would report back after I had these discussions.

**Why did I make a public announcement?**

The only way I could have meaningful discussions with our largest shareholders was to be completely forthcoming with them about my desire to take the company private. However, it wouldn't be right to share information about going private with just our largest investors without sharing the same information with all investors at the same time. As a result, it was clear to me that the right thing to do was announce my intentions publicly. To be clear, when I made the public announcement, just as with this blog post and all other discussions I have had on this topic, I am speaking for myself as a potential bidder for Tesla.

**Why did I say "funding secured"?**

Going back almost two years, the Saudi Arabian sovereign wealth fund has approached me multiple times about taking Tesla private. They first met with me at the beginning of 2017 to express this interest because of the important need to diversify away from oil. They then held several additional meetings with me over the next year to reiterate this interest and to try to move forward with a going private transaction. Obviously, the Saudi sovereign fund has more than enough capital needed to execute on such a transaction.

Recently, after the Saudi fund bought almost 5% of Tesla stock through the public markets, they reached out to ask for another meeting. That meeting took place on July 31st. During the meeting, the Managing Director of the fund expressed regret that I had not moved forward previously on a going private transaction with them, and he strongly expressed his support for funding a going private transaction for Tesla at this time. I understood from him that no other decision makers were needed

and that they were eager to proceed.

I left the July 31st meeting with no question that a deal with the Saudi sovereign fund could be closed, and that it was just a matter of getting the process moving. This is why I referred to "funding secured" in the August 7th announcement.

Following the August 7th announcement, I have continued to communicate with the Managing Director of the Saudi fund. He has expressed support for proceeding subject to financial and other due diligence and their internal review process for obtaining approvals. He has also asked for additional details on how the company would be taken private, including any required percentages and any regulatory requirements.

Another critical point to emphasize is that before anyone is asked to decide on going private, full details of the plan will be provided, including the proposed nature and source of the funding to be used. However, it would be premature to do so now. I continue to have discussions with the Saudi fund, and I also am having discussions with a number of other investors, which is something that I always planned to do since I would like for Tesla to continue to have a broad investor base. It is appropriate to complete those discussions before presenting a detailed proposal to an independent board committee.

It is also worth clarifying that most of the capital required for going private would be funded by equity rather than debt, meaning that this would not be like a standard leveraged buyout structure commonly used when companies are taken private. I do not think it would be wise to burden Tesla with significantly increased debt.

Therefore, reports that more than $70B would be needed to take Tesla private dramatically overstate the actual capital raise needed. The $420 buyout price would only be used for Tesla shareholders who do not remain with our company if it is private. My best estimate right now is that approximately two-thirds of shares owned by all current investors would roll over into a private Tesla.

**What are the next steps?**

As mentioned earlier, I made the announcement last Tuesday because I felt it was the right and fair thing to do so that all investors had the same information at the same time. I will now continue to talk with investors, and I have engaged advisors to investigate a range of potential structures and options. Among other things, this will allow me to obtain a more precise understanding of how many of Tesla's existing public shareholders would remain shareholders if we became private.

If and when a final proposal is presented, an appropriate evaluation process will be undertaken by a special committee of Tesla's board, which I understand is already in the process of being set up, together with the legal counsel it has selected. If the

board process results in an approved plan, any required regulatory approvals will need to be obtained and the plan will be presented to Tesla shareholders for a vote.

98.    On August 13, 2018, and after the market closed, Musk posted a tweet stating, "I'm excited to work with Silver Lake and Goldman Sachs as financial advisors and Wachtell, Lipton, Rosen & Katz and Munger, Tolles, & Olsen as legal advisors, to take Tesla private."

99.    On August 14, 2018, Tesla published a press release entitled "Tesla Announces Formation of Special Committee to Evaluate Potential Going Private Transaction", which stated in relevant part:

> PALO ALTO, Calif., Aug. 14, 2018 (GLOBE NEWSWIRE) -- Tesla, Inc. (the "Company") announced today that its Board of Directors has formed a special committee comprised of three independent directors to act on behalf of the Company in connection with Elon Musk's previously announced consideration of a transaction to take the Company private (the "Going Private Transaction"). The special committee has not yet received a formal proposal from Mr. Musk regarding any Going Private Transaction nor has it reached any conclusion as to the advisability or feasibility of such a transaction.
>
> The special committee is composed of Brad Buss, Robyn Denholm and Linda Johnson Rice. The special committee has retained Latham & Watkins LLP as its legal counsel and intends to retain an independent financial advisor to assist in its review of a formal proposal once received. The Company has separately retained Wilson Sonsini Goodrich & Rosati as its legal counsel in this matter.
>
> The special committee has the full power and authority of the Board of Directors to take any and all actions on behalf of the Board of Directors as it deems necessary to evaluate and negotiate a potential Going Private Transaction and alternatives to any transaction proposed by Mr. Musk. The special committee's grant of authority provides that no Going Private Transaction will be consummated without the approval of the special committee. The special committee expects to provide a further update concerning the process associated with Mr. Musk's proposal as soon as practicable.
>
> No assurances can be given regarding the likelihood, terms and details of any proposal or potential Going Private Transaction, that any proposal made by Mr. Musk regarding a potential Going Private Transaction will be accepted by the special committee, that definitive documentation relating to any such Going Private Transaction will be executed or that such a transaction will be completed.

100.    Also, on August 14, 2018, in an article entitled "Tesla Go-Private Effort Advances With Board Panel to Study Offer", *Bloomberg* reported that "…***Goldman Sachs hadn't been formally tapped as a financial adviser* . . . .**"

101.    On August 14, 2018, and on this news, Tesla stock closed at $347.64 per share, a decline of 2.5% from its August 13, 2018 closing price of $356.41.

102.    On August 15, 2018, various news outlets reported that the SEC had issued subpoenas relating to Musk's "going private" tweets.

103.    On August 15, 2018, and on this news, Tesla stock closed at $338.69 per share, a decline of 2.6% from its August 14, 2018 closing price of $347.64.

104.    On August 16, 2018, *CNBC* reported that "[t]he Securities and Exchange Commission is looking into whether Tesla CEO Elon Musk tweeted about taking the company private in order to hurt those who were shorting Tesla's stock, according to a report in the *Wall Street Journal* Thursday" and "[t]he agency [SEC] is pressing Tesla's board for details on how much information he shared with them prior to announcing his plans on Twitter . . . ."

105.    On August 16, 2018 the *New York Times* published an online article (which appeared in print on August 17, 2018) entitled "Elon Musk Details 'Excruciating' Personal Toll of Tesla Turmoil". In that article Musk confirmed that ". . . no one had seen or reviewed it before he posted . . ." his August 7, 2018 tweet – "Am considering taking Tesla private at $420. Funding secured". The article also noted that funding for this going private transaction ". . . was far from secure", and Saudi Arabia's government investment fund ". . . had not committed to provide any cash."

106.    On August 17, 2018 and on this news Tesla stock closed at $305.50 per share, a decline of 9% from its August 16, 2018 closing price of $335.45.

107.    On August 24, 2018, Musk added a post on Tesla's blog entitled "Staying Public", which stated:

**Staying Public**

Elon Musk August 24, 2018

Earlier this month, I announced that I was considering taking Tesla private. As part of the process, it was important to understand whether our current investors believed this would be a good strategic move and whether they would want to participate in a private Tesla.

Our investors are extremely important to me. Almost all have stuck with us from the time we went public in 2010 when we had no cars in production and only a vision of what we wanted to be. They believe strongly in our mission to advance sustainable energy and care deeply about our success.

I worked with Silver Lake, Goldman Sachs and Morgan Stanley, who have world-class expertise in these matters, to consider the many factors that would come into play in taking Tesla private, and to process all the incoming interest that we received from investors to fund a go-private transaction. I also spent considerable time listening to current shareholders, large and small, to understand what they think would be in the best long-term interests of Tesla.

Based on all the discussions that have taken place over the last couple of weeks and a thorough consideration of what is best for the company, a few things are clear to me:

- Given the feedback I've received, it's apparent that most of Tesla's existing shareholders believe we are better off as a public company. Additionally, a number of institutional shareholders have explained that they have internal compliance issues that limit how much they can invest in a private company. There is also no proven path for most retail investors to own shares if we were private. Although the majority of shareholders I spoke to said they would remain with Tesla if we went private, the sentiment, in a nutshell, was "please don't do this."

- I knew the process of going private would be challenging, but it's clear that it would be even more time-consuming and distracting than initially anticipated. This is a problem because we absolutely must stay focused on ramping Model 3 and becoming profitable. We will not achieve our mission of advancing sustainable energy unless we are also financially sustainable.

- That said, my belief that there is more than enough funding to take Tesla private was reinforced during this process.

After considering all of these factors, I met with Tesla's Board of Directors yesterday and let them know that I believe the better path is for Tesla to remain public. The Board indicated that they agree.

Moving forward, we will continue to focus on what matters most: building products that people love and that make a difference to the shared future of life on Earth. We've shown that we can make great sustainable energy products, and we now need to show that we can be sustainably profitable. With all the progress we've made on Model 3, we're positioned to do this, and that's what the team and I are going to be putting all of our efforts toward.

Thank you to all of our investors, customers and employees for the support you've given our company. I'm incredibly excited to continue leading Tesla as a public company. It is a privilege.

108.    On September 27, 2018, the SEC filed a complaint against Musk (in that action referred to herein as SEC/Musk), based on Musk's August 7, 2018 going private tweet.  In the SEC/Musk complaint, the SEC alleges in part:

Musk made multiple materially false statements on August 7, and taken together, his August 7 statements left market participants with the false and misleading impression that if Musk chose to take Tesla private at $420 per share, the only outstanding requirement to be satisfied was a shareholder vote. (¶ 61)

* * *

Musk's August 7 statements, taken together, also created the misleading impression that certain terms of a transaction to take Tesla private had been determined when, in fact, they had not even been explored, and in some cases, proved to be impossible. (¶ 64)

* * *

Musk made his false and misleading public statements about taking Tesla private using his mobile phone in the middle of the active trading day. He did not discuss the content of the statements with anyone else prior to publishing them to his over 22 million Twitter followers and anyone else with access to the Internet. He also did not inform Nasdaq that he intended to make this public announcement, as Nasdaq rules required. (¶ 68)

Musk's statements were premised on a long series of baseless assumptions and were contrary to facts that Musk knew…. (¶ 69)

In addition, Musk knew that Tesla's board had not yet voted on any proposal or authorized a shareholder vote on it, and in fact, Musk had not yet even submitted a formal proposal to Tesla's board. (¶ 70)

109.   On September 29, 2018, the SEC filed a complaint against Tesla (in that action referred to herein as SEC/Tesla), based on Musk's August 7, 2018 going private tweet.  In the SEC/Tesla complaint, the SEC alleges in part:

> This case involves the failure of Tesla, Inc. ("Tesla") to implement disclosure controls or procedures to assess whether information disseminated by its Chief Executive Officer, Elon Musk, via his Twitter account was required to be disclosed in reports Tesla files pursuant to the Securities Exchange Act of 1934 ("Exchange Act") within the time periods specified in the Commission's rules and forms. (¶ 1)

> * * *

> Since November 2013, Musk has used his Twitter account to publish material information about Tesla. For example, Musk has published forward-looking guidance regarding Tesla's financial metrics via Twitter. Musk has also used Twitter to disclose key non-financial information about Tesla, including production forecasts, production achievements, and new product releases. Tesla's Chief Financial Officer described Musk's Twitter statements as a "strong channel of marketing" with Musk acting as a "spokesman" for Tesla. (¶ 12)

> As of August 2018, over 22 million people, including members of the press, "followed" Musk on Twitter. His tweets were published instantaneously to those people and were also publicly available to anyone with Internet access. (¶ 13)

> * * *

> Musk did not routinely consult with anyone at Tesla before publishing Tesla-related information via his Twitter account. Likewise, no one at Tesla reviewed Musk's tweets prior to publication.  (¶ 32)

> Since November 5, 2013, when Tesla filed its Form 8-K disclosing that Musk's Twitter account would be used to disseminate material information about the company, Tesla did not have disclosure controls or procedures in place to assess whether the information published by Musk via his Twitter account was required to be disclosed in Tesla's Exchange Act reports within the time periods specified in the Commission's rules and forms.  Nor did Tesla have sufficient processes in place to ensure the information Musk published via his Twitter account was accurate or complete. Indeed, until after the August 7, 2018 tweets, Tesla had no corporate policies that specifically addressed Musk's use of Twitter. (¶ 33)

110.   On September 29, 2018, the SEC published a press release announcing that Musk agreed to settle the securities fraud charge as detailed in the SEC/Musk complaint.  The SEC

further announced that Tesla agreed to settle charges that it failed to have required disclosure controls and procedures relating to Musk's tweets as detailed in the SEC/Tesla complaint.  The settlements, which both required court approval:

> • required Tesla (among other things) to address its failures of disclosure controls and procedures by adding two new independent directors, hiring an experienced securities lawyer, establishing a new Board level committee, and implement additional controls and procedures to oversee Musk's communications to address these failures, and

> • required Musk (among other things) to resign his role of Chairman of the Board of Tesla, which shall continue for a period of three (3) years and comply with all mandatory procedures implemented by Tesla regarding oversight and preapproval of Musk communications relating to Tesla.  The Musk settlement also permanently restrained and enjoined Musk form violating Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

111.   Notwithstanding the terms of these settlements, on October 4, 2018, Musk posted a tweet saying, "Just want to [sic] that the Shortseller Enrichment Commission is doing incredible work.  And the name change is so on point[,]"  Many news organizations reported on this tweet, as exemplified by an October 4, 2018 *Reuters* article entitled "Tesla's Musk mocks SEC as judge demands they justify fraud settlement".

112.   On October 16, 2018, the court entered orders on separate Consent Motions for Entry of Final Judgement in the SEC/Musk and SEC/Tesla actions.  A copy of the SEC/Musk judgment is attached hereto as Exhibit B and a copy of the SEC/Tesla judgment is attached hereto as Exhibit C, both which are incorporated by reference.

113.   On November 2, 2018, Tesla filed its Form 10-Q with the SEC and for the quarter ending September 30, 2018.  Without identifying the dates these events occurred, Tesla disclosed:

[T]he SEC has issued subpoenas to Tesla in connection with (a) Mr. Musk's prior statement that he was considering taking Tesla private and (b) certain projections that we made for Model 3 production rates during 2017 and other public statements relating to Model 3 production.  The DOJ has also asked us to voluntarily provide it with information about each of these matters and is investigating.

## DEMAND FUTILITY ALLEGATIONS
## FOR THE BOARD OF TESLA

114.   Plaintiff brings this action derivatively in the right and for the benefit of Tesla to redress injuries suffered and to be suffered by Tesla because of the breaches of fiduciary duty and other wrongs as alleged herein by the Director Defendants.

115.   Plaintiff will adequately and fairly represent the interests of Tesla and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

116.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

117.   Because of the facts set forth herein, Plaintiff has not made a demand on the Board of Tesla to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

118.   The Tesla Board is currently comprised of eleven (11) members - Musk, Buss, Denholm, Ehrenpreis, Gracias, Jurvetson, Murdoch, K. Musk, Rice, and non-parties Ellison and Wilson-Thompson.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, *six* (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

119.   The Director Defendants face a substantial likelihood of liability in this action because they caused or otherwise permitted Tesla to issue false and misleading statements

concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with Tesla, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

120.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Tesla shareholders.

121.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

122.    The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

123.    The Director Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

### THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT

124.    As more fully discussed herein, Musk is the largest shareholder of Tesla, SolarCity, and SpaceX.  These three companies also have directors, other investors, and relatives

of Musk in common.   These overlaps, interrelationships, and financial interests between Musk and the directors identified below evidence an absence of independence.

**Defendant Musk**

125.   Defendant Musk is the CEO of Tesla and is also a Director of the Company. Tesla acknowledges in its SEC filings, including its 2018 Proxy Statement, that Musk is not independent.  As also disclosed in the 2018 Proxy Statement, as of the date of that document Musk beneficially owned 21.9% of Tesla shares.

126.   Musk owns more than 20% of Tesla's stock.  In that action commonly known as *In Re Tesla Motors, Inc. Stockholder Litigation*, C.A. No. 12711-VCS (DE Ch.) the Court found (in March 2018) that it was reasonably conceivable that E. Musk was the Company's controlling stockholder.

127.   Musk cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Buss**

128.   Buss is forever indebted to Musk.  From August 2014 to February 2016 Buss served as the Chief Financial Officer ("CFO") of SolarCity Corp.  On information and belief, Buss received approximately $32 million for acting as CFO of SolarCity Corp and for this very short period of work.

129.   In its Form DEF 14A filed with the SEC on April 22, 2015 (the "2015 Proxy Statement"), Tesla admitted that Buss was not an independent director.

130.   Buss also received out-sized compensation as a member of the Tesla Board.  By way of examples, and as disclosed in Tesla's 2016 and 2018 Proxy Statements, for serving as a Tesla director, Buss received compensation valued at $4,954,785 in 2015 and $3,357,002 in 2017.

**Defendant Denholm**

131.     Denholm is not capable of considering a pre-litigation demand because of the out-sized compensation she receives as a member of the Tesla Board of Directors.  By way of example and as disclosed in Tesla's various Proxy Statements, for serving as a Tesla director Denholm received compensation valued at $7,181,066 in 2014, $4,979,785 in 2015, and $4,921,810 in 2017.  By way of comparison, on January 1, 2017, Denholm joined Telstra (a telecommunications and technology company) as its Chief Operating Officer ("COO") and earned $890,006 in total compensation for that year.  Denholm became Telstra's CFO on October 1, 2018.  On November 7, 2018, Tesla announced that Denholm was appointed as Chairperson of the Tesla Board of Directors, "effective immediately", and that she would be leaving Telstra as its CFO.   In its own November 8, 2018 announcement, Telstra clarified Tesla's earlier representations and stated that Denholm would continue in her role with Telstra for her six-month notice period with her final date of employment being May 6, 2019.

**Defendant Ehrenpreis**

132.     Ehrenpreis is not capable of considering a pre-litigation demand because he has a close personal and professional relationship with Musk.

133.     Ehrenpreis personally, and through investment companies he controls, has made significant investments in Tesla, SpaceX and SolarCity.

134.     Ehrenpreis has been a Managing Partner and co-owner of venture capital firm DBL Partners, which he co-founded with fellow managing partner and co-owner Nancy Pfund ("Pfund").  Pfund was a member of SolarCity's board of directors and was an observer of Tesla's Board from 2006 to 2010.   Pfund, as one of two members on SolarCity's special committee, negotiated and approved Tesla's acquisition of SolarCity.

135.     In addition to DBL Partners, Ehrenpreis is a manager of DBL Partners Fund III ("DBL III"), an affiliate fund of DBL Partners.  In addition to DBL and DBL III, Ehrenpreis'

other investment company, Technology Partners, invested over $13 million in Tesla's early financing rounds.

136.    In addition to DBL Partners, Pfund is the managing director and founder of DBL Investors, LLC ("DBL Investors"), an affiliate fund of DBL Partners.  DBL Investors contributed at least $3.6 million over three of SolarCity's funding rounds.   At the time of the Acquisition, Pfund beneficially owned 1,554,114 shares of SolarCity common stock.  She is a close friend of Musk's and has said that "[h]e's always been a master of the universe in my mind."

137.    Ehrenpreis is an investor in Mapbox, Inc., which provides custom online maps, and serves on its board of directors.  In December 2015, Tesla and Mapbox entered into an agreement pursuant to which Tesla pays Mapbox ongoing fees, including $5 million over the first twelve months of the agreement.

138.    Ehrenpreis also received out-sized compensation as a member of the Tesla Board.  By way of example and as disclosed in Tesla's 2016 Proxy Statement, for serving as a Tesla director, Ehrenpreis received compensation valued at $7,293,683 in 2015.

139.    As an example of level of personal relationship between Ehrenpreis and Musk, in September 2015, Musk gave Ehrenpreis one of the first Tesla Model X ever produced.  And two years later, Musk gave Ehrenpreis the rights to the first Tesla Model 3.  Ehrenpreis then paid for the Model 3 and gifted the car back to Musk as part of Musk's 46th birthday present.

140.    As stated in the 2018 Proxy Statement, Tesla admits:

> •    Mr. Ehrenpreis is a manager of DBL Partners Fund III ("DBL III"). Each of Mr. Ehrenpreis and DBL III is a minority investor in SpaceX. Tesla and certain Tesla directors have relationships with SpaceX […]
> •    Mr. Ehrenpreis is a co-owner of DBL Partners. Another co-owner of DBL Partners is a manager of DBL Investors, which is also an investor in SpaceX […]
> •    Mr. Ehrenpreis serves a member of the board of directors of Mapbox Inc., a provider of custom online maps ("Mapbox"). In December 2015, Tesla entered into an agreement with Mapbox relating to a vehicle map-related project, pursuant to which Tesla made a prepayment of $3 million in

2016 for certain fees. Tesla will pay Mapbox to the extent any additional fees for services are incurred in excess of such prepaid fees […]

**Defendant Gracias**

141.    Gracias is not capable of considering a pre-litigation demand because he has a close personal and professional relationship with Musk.

142.    In addition to serving as a Tesla director, Gracias also serves as a director on the board of SpaceX, which is controlled by Musk, and served as a director of SolarCity prior to its acquisition by Tesla.

143.    Gracias' relationship with Musk starts around 2001. Gracias is the founder, managing partner, CEO, Chief Investment Officer, director and sole owner of private equity firm VMC, d/b/a Valor Equity Partners ("Valor").   In 2001, Gracias and Valor invested in then-startup PayPal.  Gracias' PayPal investment led Musk to present Gracias and Valor with the opportunity to invest in "Tesla Motors," Tesla's predecessor.  Musk also gave Gracias the opportunity to participate in several pre-IPO venture funding rounds for SolarCity and SpaceX.

144.    Musk and his brother K. Musk have personally invested in various Valor funds. As a manager and/or owner of these funds, Gracias serves as a fiduciary to Musk and K. Musk.

145.    As stated in the 2018 Proxy Statement, Tesla admits:

- Mr. Gracias is the Chief Executive Officer, director and majority owner of Valor Management Corp. ("VMC"). Certain VMC-advised funds are a minority investor in SpaceX, and Mr. Gracias is a director of SpaceX. Tesla and certain Tesla directors have relationships with SpaceX […]
- VMC provided certain consulting services to Tesla relating to operational optimization in 2017 and costs of $34,347 were reimbursed to it as part of those services.
- The Elon Musk Revocable Trust dated July 22, 2003, of which Elon Musk is the trustee, is a limited partner of Valor Equity Partners II, L.P., which is a fund advised by VMC.
- Kimbal Musk is a limited partner of Valor Equity Partners II, L.P. and Valor Equity Partners III-A, L.P., which are funds advised by VMC.

146.    To this day, Valor relies on testimonials from Musk and his relatives to promote Gracias' company.   Musk is quoted, "I'd like to thank Valor for being a key investor.  And not

just an investor, but a strategic partner.  I don't think we would've made it without their help, so

thank you."  And Peter Rive on behalf of SolarCity (and Musk's cousin) is quoted in part, "Valor

is simply the best investor I've ever worked with."

147.    Gracias also received out-sized compensation as a member of the Tesla Board.  By

way of example and as disclosed in Tesla's Form DEF 14A filed with the SEC on April 15, 2016

(the "2016 Proxy Statement") for serving as a Tesla director Gracias received compensation

valued at $9,790,505 in 2015.

148.    In May 2018 Institutional Shareholder Services ("ISS"), a proxy advisory firm,

recommended that shareholders vote against Gracias as director also in Tesla's 2018 elections

because after its analysis ISS viewed Gracias as non-independent.  As reported in a May 19, 2018

*Bloomberg* article entitled "Tesla Shareholders Urged to Separate Chairman's Role From Musk",

ISS is quoted:

> Gracias was previously categorized as independent, but he is now categorized as
> non-independent because Valor Management Corp., of which Gracias is CEO and
> majority owner, provided consulting services to Tesla in 2017, ISS wrote, noting
> that VMC provided Tesla consulting services relating to "operational optimization"
> and was reimbursed over $34,000 for those services.

149.    In May 2018, CtW Investment Group ("CtW") recommended that shareholders

vote against Gracias as director also in Tesla's 2018 elections.  In a letter filed with the SEC on

May 9, 2018 on Form PX14A6G, CtW wrote that "Antonio Gracias, a venture capital investor

with multiple ties to Elon Musk, lacks the independence to serve as Lead Independent director,

and has not initiated the much needed process of board renewal."  In this letter CtW also stated:

> Antonio Gracias has extensive personal and business ties to Elon Musk, which we
> believe make him especially ill-suited for a leadership role on the Tesla board. Mr.
> Gracias, along with his venture capital firm Valor Management Corp., participated
> in four Tesla venture funding rounds between 2005 and 2008, as well as a pre-IPO
> venture debt raise in 2009, joined the Tesla board in 2007, and was named Lead
> Independent Director in 2010. Notably, he does not appear to have served on the
> board of any public companies that are not associated either with Valor (i.e., its
> portfolio companies) or Elon Musk. Mr. Gracias has been an investor in multiple

companies started by Elon Musk, including PayPal, Solar City (where he was a director), and SpaceX (where he remains a director). Elon Musk in turn has invested in at least one Valor fund, and is a personal friend of Mr. Gracias, to who he gave the second Tesla Roadster ever built.

**Defendant Jurvetson**

150.    The 2018 Proxy Statement represents that ". . . Jurvetson has been a member of [Tesla's] Board since June 2009.  Mr. Jurvetson has been on a leave of absence from the Board since November 2017 […] Mr. Jurvetson is a director of SpaceX, from which he is also on a leave of absence."  The 2018 Proxy Statement also states that "Mr. Jurvetson was a Managing Director of Draper Fisher Jurvetson ["DFJ"], a venture capital firm, from 1995 to 2017."

151.    The 2018 Proxy Statement provides no information or explanation for Jurvetson taking a leave of absence from the Tesla and SpaceX Boards.  Tesla also provides no information as to why Jurvetson "left" DFJ in 2017.  In fact, Jurvetson was forced out of DFJ after it completed an investigation.  As reported in a *USA Today* article on November 18, 2018:

> Steve Jurvetson left his venture capital firm after an internal investigation ***uncovered a pattern of deception*** with women including extramarital affairs, some of which blurred the line between his professional and personal lives […]. [Emphasis added]

152.    Jurvetson also received out-sized compensation as a member of the Tesla Board. By way of example and as disclosed in Tesla's 2016 Proxy Statement, for serving as a Tesla director, Jurvetson received compensation valued at $6,095,984 in 2015.

153.    On March 28, 2018 and in that action commonly known as *In Re Tesla Motors, Inc. Stockholder Litigation*, C.A. No. 12711-VCS (DE Ch.), the court found that Jurvetson is "beholden" to Musk, stating:

> Jurvetson also has substantial connections with the third entity in Musk's "pyramid," SpaceX.  He serves as a member of the board of directors of SpaceX.  And between 2009 and 2015, DFJ participated in four early venture funding rounds for SpaceX and remains a "significant stockholder."

> Musk, in turn, is a frequent investing partner with DFJ principals, including Jurvetson and DFJ co-founder, Tim Draper, and is invested in DFJ itself.  "Although the actual extent of these relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough" to allow a reasonable inference that ***Jurvetson is beholden to Musk***.  […] [Emphasis added].

154.    As an example of Jurvetson being "beholding" to Musk, Musk gave Jurvetson the first Tesla Model S ever made and gave him the second Model X ever made.

**Defendant Murdoch**

155.    Murdoch also received out-sized compensation as a member of the Tesla Board. As disclosed in Tesla's 2018 Proxy Statement, for serving as a Tesla director, Murdoch received compensation valued at $1,926,972 in 2017.

156.    In May 2018, CtW recommended that shareholders vote against Murdoch as director in Tesla's 2018 elections.   In a letter filed with the SEC on May 9, 2018 on Form PX14A6G, CtW wrote that "James Murdoch, the CEO of 21st Century Fox, lacks relevant industry experience, and has been deeply implicated in multiple corporate scandals at Fox and News Corp."  In this letter CtW also stated in relevant part:

> [A]s an executive and director, Mr. Murdoch has been caught up in multiple corporate scandals: he had executive responsibility for the UK newspaper News of the World which was found to have printed stories using information obtained through illegal phone hacking, and has been an executive and director at 21st Century Fox throughout the period in which endemic sexual harassment has resulted in numerous settlements, lawsuits, and resignations by executives. Mr. Murdoch has previously served as a director of Sotheby's and GlaxoSmithKline, but resigned from both boards after 75% of News Corp.'s outside shareholders voted against his re-election in 2011. Despite joining the Tesla board on July 13, 2017, he has not been assigned to any board committees.

**Defendant Rice**

157.    Rice is also not able to consider a pre-suit demand because of the out-sized compensation she received as a member of the Tesla Board.  As disclosed in Tesla's 2018 Proxy Statement, for serving as a Tesla director, Rice received compensation valued at $1,933,924 in 2017.

**Defendant K. Musk**

158.    Tesla acknowledges in its SEC filings, including its 2018 Proxy Statement, that K. Musk is not independent.  K. Musk and Musk are brothers.

159.    Additionally, K. Musk is a director of SpaceX, which is controlled by his brother (Musk).  K. Musk was given the opportunity to invest in Defendant Gracias' investment firms because of his brother (Musk).

160.    K. Musk also received out-sized compensation as a member of the Tesla Board. By way of example and as disclosed in Tesla's 2016 Proxy Statement, for serving as a Tesla director, K. Musk received compensation valued at $4,964,381 in 2015.

161.    In May 2018, CtW recommended that shareholders vote against K. Musk as director in Tesla's 2018 elections.  In a letter filed with the SEC on May 9, 2018 on Form PX14A6G, CtW wrote that "Kimbal Musk – Elon Musk's brother – shares several of Mr. Gracias' conflicts, has no professional experience in the auto industry, and has proven ineffective as a public company director at Chipotle."  In this letter CtW also stated in relevant part:

> Kimbal Musk is Elon Musk's brother, and has served on the Tesla Board since April 2004.  He is also the cousin of Lyndon and Peter Rive, Solar City's co-founders. Kimbal Musk is also an investor in two Valor venture capital funds, which are managed by Mr. Gracias. While Tesla acknowledges that Kimbal Musk is not an independent director, the board has nevertheless re-nominated him: we view this decision, following both Tesla's poor first quarter and the court's citation of extensive board conflicts, all but inexplicable. Or, rather, we would find it inexplicable if Tesla were anything like a well-run public company. Unfortunately, we know exactly why Kimbal Musk was re-nominated despite lacking any relevant industry experience or possessing a track record of effective public company board service (see below), and his re-nomination goes to the heart of the problems with Tesla's board: too many of these directors, including all three of this years' nominees, are incapable or unwilling to contradict Elon Musk's whims and finally insist on a board renewal process that provides shareholders with competent and effective representation.

162.    As stated in the 2018 Proxy Statement, Tesla admits that "Kimbal Musk is a limited partner of Valor Equity Partners II, L.P. and Valor Equity Partners III-A, L.P., which are funds advised by VMC [Valor]."

**Defendants Denholm, Buss, and Gracias**

163.    Defendants Denholm, Buss, and Gracias are members of Tesla's Audit Committee.

164.    Defendants Denholm, Buss, and Gracias breached their fiduciary duties of due care, loyalty, and good faith, because as members of the Audit Committee, *inter alia*, they allowed or permitted false and misleading statements to be disseminated as alleged herein and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.    Therefore, Defendants Denholm, Buss, and Gracias face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Musk, Buss, Denholm, Ehrenpreis,
Gracias, Jurvetson, Murdoch, K. Musk, and Rice**

165.    Musk, Buss, Denholm, Ehrenpreis, Gracias, Jurvetson, Murdoch, K. Musk, and Rice are each named as a defendant in the Securities Class Action.    Each of these defendants face a substantial likelihood of liability in the Securities Class Action and other pending litigations relating to the facts and matters alleged herein and based thereon, any demand upon them in this action is futile.

## FIRST CAUSE OF ACTION

### (Against the Director Defendants for Breach of Fiduciary Duty)

166.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

167.    The Director Defendants owed and owe Tesla fiduciary obligations.    By reason of their fiduciary relationships, the Director Defendants owed and owe Tesla the highest obligation of good faith, fair dealing, loyalty and due care.

168.    The Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

169.    The Director Defendants had actual or constructive knowledge that Tesla lacked internal controls and procedures to ensure that Musk's communications with the investing public were accurate, truthful, and otherwise complied with all laws and regulations.    These actions (or

lack thereof) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

170.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Tesla has sustained significant and actual damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

171.    Plaintiff, on behalf of Tesla, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against the Director Defendants for Unjust Enrichment)

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of Tesla in the form of salaries, bonuses, and other forms of compensation.

174.    Plaintiff, as a shareholder and representative of Tesla, seeks restitution from the Director Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against the Director Defendants for Waste of Corporate Assets)

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Director Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

177.    As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

178.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    During the Relevant Period, the Director Defendants disseminated, permitted, or approved public statements that failed to disclose (a) that Musk's August 7, 2018 tweets regarding taking Tesla private were not truthful or accurate; (b) that funding was secured for this "going private" transaction was not truthful or accurate; (c) that lacked internal controls and procedures to ensure that Musk's communications with the investing public were accurate, truthful, and otherwise complied with all laws and regulations; and (d) that as a result, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

181.    As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## FIFTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9)

183.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.   SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.   Specifically, the Company's Proxy Statements identified herein violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because each included materially false and misleading information and failed to disclose (a) that Tesla lacked internal controls and procedures to ensure that Musk's communications with the investing public were accurate, truthful, and otherwise complied with all laws and regulations; and (d) that as a result, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

185.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in Tesla's Proxy Statements were false and misleading.

186.   The misrepresentations and omissions in Tesla's Proxy Statements were material to Company stockholders and investors in determining whether to invest in Tesla (and to what extent).   The Proxy Statements were an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

187.   The Company was damaged as a result of these defendants' material misrepresentations and omissions in the Proxy Statements.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.      Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets;

C.      Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 11, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:     (212) 983-1300
Fax:     (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiff*